NICOLA T. HANNA
United States Attorney
PATRICK R. FITZGERALD
Assistant United States Attorney
Chief, National Security Division
LISA E. FELDMAN (Cal. Bar No. 130019)
Cyber & Intellectual Property Crimes Section
     1500 United States Courthouse
     312 North Spring Street
     Los Angeles, California 90012
     Telephone: (213) 894-0633
     Facsimile: (213) 894-0141
     E-mail:   lisa.feldman@usdoj.gov

Attorneys for Plaintiff
UNITED STATES OF AMERICA

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| UNITED STATES OF AMERICA,<br><br>        Plaintiff,<br><br>          v.<br><br>ROGELIO VASQUEZ,<br><br>        Defendant. | No. SACR 18-0085-JLS<br><br>GOVERNMENT'S SENTENCING POSITION; EXHIBITS<br><br>Hearing Date: May 30 2019<br>Hearing Time: 2:00 p.m.<br>Location:   Courtroom of the<br>           Hon. Josephine L.<br>           Staton |
| --- | --- |

     Plaintiff United States of America, by and through its counsel of record, the United States Attorney for the Central District of California and Assistant United States Attorney Lisa E. Feldman, hereby files its sentencing position in the above-entitled case.

//

//

//

//

//

//

//

This sentencing position is based upon the attached memorandum of points and authorities, the attached Exhibits, the files and records in this case, and such further evidence and argument as the Court may permit.

Dated: May 22, 2019                     Respectfully submitted,

                                        NICOLA T. HANNA
                                        United States Attorney

                                        PATRICK R. FITZGERALD
                                        Assistant United States Attorney
                                        Chief, National Security Division


                                        _____/s/_____
                                        LISA E. FELDMAN
                                        Assistant United States Attorney

                                        Attorneys for Plaintiff
                                        UNITED STATES OF AMERICA

1

**MEMORANDUM OF POINTS AND AUTHORITIES**

2

**I.   INTRODUCTION**

3

On January 17, 2019, defendant Rogelio Vasquez ("defendant")

4
pleaded guilty to four counts of a 30-count Indictment, charging him

5
with violations of Wire Fraud, in violation of 18 U.S.C.

6
§ 1343, Trafficking in Counterfeit Goods, in violation of 18 U.S.C.

7
§ 2320(a)(1), and Trafficking in Counterfeit Military Goods, in

8
violation of 18 U.S.C. § 2320(a)(3).[1]  The charges arise from an

9
undercover investigation initiated by the U.S. Department of Defense-

10
Office of Inspector General ("DOD-OIG"), the National Reconnaissance

11
Office ("NRO"), and Homeland Security Investigations ("HSI") into

12
defendant's importation and trafficking of counterfeit integrated

13
circuits suspected of entering the U.S. military supply chain.[2]  The

14
investigation revealed that defendant, in fact, imported counterfeit

15
integrated circuits from suppliers in China and re-sold them to

16
customers in the United States, many of which were ultimately

17
purchased by defense contractors for use in the U.S. military.

18
The government is in agreement with the criminal history and

19
offense level calculations of the Presentence Investigation Report

20
("PSR") as well as its factual findings.  The U.S. Probation Office

21

22

---

[1] At his change of plea hearing, defendant admitted his true
23
name as "Rogelio Vasquez Aguilera." (See Docket No. 27.)  The
Presentence Report, page 3, lists this name as one of defendant's
24
aliases.

[2] An integrated circuit ("IC") is an electronic circuit
25
consisting of components and connectors contained on a semiconductor
chip.  IC's are used in a variety of applications, including consumer
26
electronics, transportation, medical equipment, military equipment,
aircraft equipment, and spacecraft.  ICs are generally marked with
27
the name or trademark of the original equipment manufacturer ("OEM")
as well as a unique part number, a date code (year and week
28
manufactured), a production lot code, and a code reflecting the
country of assembly/origin.  (PSR § 14.)

("USPO") has recommended a sentence of 46 months recommendation. Taking into account the aggravating factors in this case, as well as defendant's attempted assistance to the government described in the supplemental sentencing position being concurrently filed under seal, the government recommends a one-level downward variance and a sentence as follows: (a) 45 months' imprisonment; (b) 3 years' supervised release; (c) a special assessment of $400; and (d) restitution in the total amount of $144,000.00.  Defendant has agreed to forfeit all monies, property and assets of any kind derived or acquired as a result of his scheme, and thus, the government further requests that the Court incorporate the preliminary order of forfeiture into the judgment so it may be final.

## II.   STATEMENT OF FACTS

For at least seven years, from approximately July 2009 through May 31, 2006 (when the search warrant was executed), defendant was a reseller who sold counterfeit IC's he imported from suppliers in China, and resold them to customers in the United States. (Plea Agmt., ¶ 16; PSR, ¶ 16.) Defendant operated his company, PRB Logics, out of his home in Orange County, California and received shipments at a mail drop in Costa Mesa, California.  (Id.)

In order to deceive customers and end users, defendant knew that the ICs he sold were old, used and/or discarded and that his Chinese suppliers had pulled the ICs off of discarded circuit boards in China, sanded off all of the markings, and then repainted them in a process commonly referred to as "blacktopping." (Plea Agmt., ¶ 16; PSR, ¶ 17.) Defendant further knew that after they were blacktopped, the ICs were remarked with trademarked marks and then further remarked with an altered date code, lot code and/or country of origin

1  code, to appear as if they were new and original equipment

2  manufacturer (OEM) parts. (Id.)  Defendant then resold the repainted

3  and remarked ICs in an effort to deceive customers and end users into

4  thinking that the parts were new parts.  (Id.; PSR, ¶ 18.)

5       During the investigation, agents learned that in August 2012,

6  defendant purchased counterfeit ICs from China and sold them to a

7  defense subcontractor located in the United States, which, in turn,

8  supplied the parts to a defense contractor.  The counterfeit parts

9  ended up in a classified weapon system used by the U.S. Air Force.

10  (Plea Agmt., ¶ 16; PSR, ¶ 20.)

11       On May 14, 2014, in an email to one of his suppliers in China,

12  defendant indicated that parts requested were for military use by

13  stating in part, "The other problem is this parts are going to the

14  government.  This is why we need to be careful."  (PSR, ¶ 21.)

15       Between November 2015 and May 2016, five separate times,

16  defendant, using the alias "James Harrison," sold a total of 82

17  counterfeit Xilinx ICs and 24 counterfeit Analog Devices ICs to a

18  federal undercover agent ("UCA") posing as an electronics reseller.

19  (Plea Agmt., ¶ 16; PSR, ¶¶ 22-27.)  All of the part numbers were

20  historically used in military applications.  (Id.)  Defendant made

21  many incriminating statements during the recorded undercover calls.

22       During negotiations for the fourth undercover purchase in March

23  2016, defendant told the UCA that his Chinese supplier would do a

24  perfect job of remarking the parts.  The UCA replied that he believed

25  his customer would be reselling the ICs to the U.S. military. (Plea

26  Agmt., ¶ 16; PSR, § 23.)  In another call, after the UCA said he

27  needed the ICs to pass for the real thing, defendant told him not to

28  worry and that his (Chinese supplier) would send photos.  (Id.)

During negotiations for the fifth undercover purchase, during a call on April 5, 2016, defendant told the UCA that his suppliers pulled ICs from circuit boards in China and they were later remarked, but he did not tell customers that the parts are refurbished because he knew they would not buy them "because practically no one wants refurbished parts." (Plea Agmt., ¶ 16; PSR, ¶ 24.)

In a call on April 21, 2016, the UCA told defendant that the UCA had won the bid to supply the ICs to a top 10 defense contractor. The UCA then told defendant that the defense contractor would be using the ICs in the B-1 Bomber. The UCA then explained that the defense contractor needed eight parts every two months for six months, but the defense contractor needed a specific date code of "1446" (which the UCA knew from Xilinx was a fake date code for that part). (Plea Agmt., ¶ 16; PSR, ¶ 25.) Despite being told that the ICs would be used by the U.S. military in the B-1 Lancer Bomber military aircraft, defendant told the UCA he would instruct his Chinese supplier to mark the ICs with the date code, "1446." The next day, that's exactly what he did and defendant later sold those remarked ICs to the UCA. (Plea Agmt., ¶ 16; PSR, ¶¶ 26-27.)[3]

In May 2016, defendant also sold 8,000 counterfeit Intel ICs to Company A for $80,000 ($10/per IC), and Company A resold 7,783 of them to its customer, Company B, in Orange County, California. (Plea Agmt., ¶ 16; PSR, ¶¶ 28-29.) Company B, a defense contractor and subcontractor that does business with the U.S. military as well as

---

[3] Had the counterfeit ICs been used in the B-1 Lancer Bomber military aircraft, they would likely have caused impairment of combat operations or other significant harm to a combat operation because a failure of the counterfeit ICs would impact the B-1's operational capabilities. (Plea Agmt., ¶ 16.)

4

other defense contractors, purchased the Intel part, S80C196KB12, to use in products for numerous customers, including products sold to the U.S. Army, Navy, and Marine Corps, which were used in various military applications.  (Plea Agmt., ¶ 16; PSR, ¶ 29.)

Emails later seized from defendant's computer showed that despite the fact that the purchase order from Company A specified new parts, defendant obtained the 8,000 ICs from Chinese suppliers which he knew had been pulled from discarded circuit boards, blacktopped and then remarked with the Intel mark, part number, dates codes and lot codes.  (Plea Agmt., ¶ 16; PSR, ¶¶ 26-27.)  Defendant also instructed his Chinese suppliers on how to remark the ICs. (Id.)

Equally disturbing, defendant instructed a test laboratory in China to prepare two separate versions of a test report on a batch of the 8,000 counterfeit ICs:  one for defendant with all of the test results, and a second, sanitized version for defendant's customer (Company A) *omitting* the results of the visual inspection and permanency/marking tests[4] -- which would have revealed that the ICs were used, remarked, and/or in poor condition. If it only got the sanitized report, Company A (and thus, Company B) would not discover that the ICs were, in fact, used and remarked.  (Plea Agmt., ¶ 16; PSR, ¶¶ 18, 30.)

Defendant also worked with his Chinese suppliers to use shipping methods to avoid seizures by CBP.  On April 18, 2016, after one of

---

[4] The visual inspection refers to looking at the exterior of the IC for evidence of wear or damage, such as scratches, bent leads, oxidation, non-uniform coating, etc.  Permanency tests include an acetone test, in which acetone is applied to the surface of the IC (usually with a cotton swab).  If some of the black color comes off, that indicates that the IC is blacktopped, i.e. repainted with black paint and then remarked.  These tests will generally indicate if a part is used or remarked.

1    his Chinese suppliers confirmed it was shipping the ICs directly to

2    defendant's customer (Company A) to avoid seizure, defendant

3    instructed the supplier not to use the supplier's name on the

4    shipment because defendant did not want the customer to contact the

5    supplier because defendant told his customer that the parts were new.

6    (Plea Agmt., ¶ 16; PSR, ¶ 31.)  On May 10, 2016, per his

7    instructions, defendant received both versions of the test report and

8    forwarded the sanitized version to Company A (which it forwarded to

9    to its customer, Company B).  (Plea Agmt., ¶ 16; PSR, ¶ 32.)[5]

10        On May 26, 2016, federal agents executed a search warrant at the

11   office of PRB Logics, which was also defendant's residence, in

12   Orange, California.  At the time of the search, agents seized 1,307

13   counterfeit Xilinx ICs in his inventory, some of which were marked

14   with part numbers historically used in military applications.  (Plea

15   Agmt., ¶ 16; PSR, ¶ 34.) During the search, agents also seized

16   $97,362 in cash, hidden throughout his residence, which included

17   proceeds from his $80,000 sale of counterfeit Intel IC's to Company

18   A.  (Plea Agmt., ¶ 16; PSR, ¶ 35.)

19   **III. THE PSR AND USPO RECOMMENDATION**

20        On April 2, 2019, the USPO disclosed its PSR to the parties.

21   Consistent with the parties' plea agreement, the PSR concluded that

22

23   ───────────────

24        [5] In order for the Court to better understand the significance
     of the two versions of the report – as well as to see photographs of
25   some of the counterfeit Intel ICs that defendant sold to Company A –
     the original and sanitized versions are attached hereto as Exhibits 1
26   and 2, respectively. Exhibit 1 is the complete, 19-page report,
     containing all of the tests done and indicating failures in red. Page
27   11 of 19, at the bottom, shows a photo of a cotton swab "dirty after
     Retopping Test" after ink came off the IC during the acetone test.
28   Exhibit 2 is the "sanitized" 9-page report and as the report
     reflects, the failed tests relating to the visual inspection and re-
     topping (acetone) test have been removed.

defendant's base offense level is 8 under USSG § 2B5.3(a).  (PSR

¶ 46.)   The PSR also concluded that defendant's offense level should

be increased as follows: 1) 14 levels under USSG § 2B5.3(b)(1)(H),

for a total infringement amount more than $550,000 and up to $1.5

million, specifically, $894,218; 2) two levels under USSG

§ 2B5.3(b)(3)(A), for an offense involving the manufacture or

importation of infringing items (i.e., the counterfeit ICs); and 3)

two levels under USSG § 2B5.3(b)(7) for an offense involving a

counterfeit military good, the use, malfunction, or failure of which

is likely to cause impairment of combat operations or cause other

significant harm to a combat operation – namely, that defendant knew

the parts were to be used in the B-1 Bomber aircraft and had they

been so used, they would likely have caused impairment of combat

operations because a failure of the counterfeit ICs would impact the

B-1's operational capabilities. (PSR ¶ 49; Plea Agmt., ¶ 16.)   This

results in an offense level of 26.  (PSR ¶ 53.)   With acceptance of

responsibility, defendant's offense level is 23.   (PSR ¶ 57.)

The PSR also concluded that defendant has zero criminal history

points, resulting in a Criminal History Category of I.  (PSR ¶¶ 62-

63.)   With an offense level of 23, and Criminal History Category I,

the PSR concluded that defendant's Guideline Range is 46 to 57

months.  (PSR ¶ 100.)   The USPO recommended a sentence of 46 months

imprisonment, three years of supervised release, and a special

assessment of $400. (USPO Rec. Ltr. at 1-2.)[6]

---

[6] The Probation Officer recommended that all fines be waived on
the basis that defendant does not have the ability to pay a fine in
addition to restitution.

7

## IV.  DEFENDANT'S SENTENCING POSITION

On April 24, 2019, defendant filed his sentencing position. Defendant concurs with the sentencing guidelines analysis and criminal history calculation contained in the PSR.  (Defendant does not dispute any of the factual findings set forth in the PSR.) Defendant, however, is requesting a sentence of "no more than 36 months imprisonment" based on his personal history and post-indictment attempted assistance to the government.  On April 26, 2019, defendant filed a supplement to his sentencing position, attaching numerous letters of support from family and friends, and a certificate, in support of his sentencing position.

## V.  THE GOVERNMENT'S RECOMMENDATION AND ANALYSIS OF THE FACTORS PURSUANT TO 18 U.S.C. § 3553(a)

The government respectfully requests that the Court adopt the factual findings, Guidelines calculations, and criminal history calculation of the PSR in this matter.  For the reasons set forth below and in the supplemental sentencing position, the government also requests that the Court impose the following sentence, based on the relevant factors that this Court can consider for sentencing, including 18 U.S.C. § 3553(a): (a) a mid-range sentence of 45-months imprisonment; (b) 3 years supervised release; (c) a special assessment of $400; and (d) restitution in the amount of $144,000 to be paid to Intel Corporation.  The government also requests the Court to incorporate the preliminary order of forfeiture into the judgment.

The sentence recommended by the government is reasonable within the meaning of Title 18, United States Code, Section 3553(a) and sufficient but not greater than necessary to meet the sentencing goals of 18 U.S.C. § 3553(a).  As set forth in more detail below, the

government's recommended sentence reflects the extremely serious nature of the offense and related aggravating facts that exist in this case, while also taking into account defendant's post-indictment attempted assistance to the government.  While the aggravating factors in this case could easily warrant a high-end sentence, on balance, the government believes that a mid-range sentence is most appropriate taking into account all of the factors.

**A.   Nature and Circumstances of the Offense**

With respect to the nature and circumstances of the offense, defendant's offense is an extremely serious one with potentially dangerous consequences to health and safety.  For at least seven years, defendant knowingly imported and sold counterfeit integrated circuits many of which were purchased by defense contractors for use in military applications.  For example, in 2012, some of those counterfeit ICs ended up in a classified Air Force program. Defendant was well aware that some of the ICs he sold would go to the military.  Indeed, in 2016, defendant sold counterfeit ICs to the UCA even though he knew -- because the UCA told him -- that the ICs would be used in the B-1 Bomber aircraft.  Defendant even instructed his supplier to remark the IC with the date code the UCA's customer needed.  Had the counterfeit ICs been used in the B-1 Bomber, the consequences could have potentially been catastrophic.

Of equal concern, in 2016, defendant sold 8,000 counterfeit ICs to Company A, most of which were resold to Company B, in reliance on the sanitized test report that was prepared at defendant's direction. Company B then installed them into products, many of which were resold to defense contractors for use in military applications.

The Senate Armed Services Committee outlined some of the dangers of counterfeit electronic parts entering the military supply chain:

> Counterfeit electronic parts pose a significant risk to the performance of defense systems.  Even if counterfeits made from previously used parts and salvaged from e-waste may initially perform, there is no way to predict how well they will perform, how long they will last, and the full impact of failure.  As Samsung, a major semiconductor manufacturer, put it, "[s]emiconductor components have limited useful lives." [Footnote omitted] Xilinx, another semiconductor manufacturer [and one of defendant's victims], described the risks of using parts salvaged from e-waste:

>> The devices may have been reclaimed and potentially exposed to excessive heat in order to dismount them from a circuit board.  These cases pose a significant reliability risk owing to the potential exposure to excessive heat and electro-static discharge (ESD) damage . . . . With respect to ESD, there are many potential damage mechanisms that could have affected the devices.  Some of these could be *catastrophic*; others may create a damage mechanism that is latent for an undetermined amount of time . . . . Though the devices may initially function, it would be next to impossible to predict what amount of life is remaining, or what damage may have been caused to the circuitry. [Footnote omitted]

> A second danger associated with counterfeit electronic parts has to do with how they are marked.  The marking on an electronic part includes information that allows a buyer to determine its performance grade.  Knowing a part's performance grade is critical as military grade parts, for example, are certified to operate over a broader temperature range than industrial or commercial grade parts.  As a result, military grade parts may be used when a device is expected to be exposed to extreme conditions, such as in defense applications.  Counterfeiters, however, often remove the original manufacturer's marking on a part and remark it with an entirely different part number.  So, while a part may be of commercial grade, it could be remarked as military grade. Such remarked parts may pass basic testing but fail in the field when they are exposed to extreme temperatures and other conditions. [Footnote omitted.]

> The President of the Semiconductor Industry Association likened using counterfeit parts to "playing Russian roulette," explaining, "[w]ith luck, the chip will not function at all and will be discovered in testing.  But in some cases, the chip may work for awhile, but because of the environmental abuse, it could fail at a *critical* time –

when the product containing the chip is stressed – as in *combat*." [Footnote omitted.]

Contractors conduct acceptance testing of defense systems where the systems may be subjected to heat, vibration and other stresses.  However, such testing may not weed out all counterfeit parts.  According to General Patrick O'Reilly, the Director of the Missile Defense Agency (MDA) [footnote omitted]:

> A counterfeit part may pass all production testing. However, it is possible that the part was damaged during unauthorized processing (e.g. removing the part from a previous assembly, or sanding the surface in order to place a new part number) causing the deployed system to fail.  Similarly, reliability may be affected because a counterfeit part may be near the end of its useful life when it is installed.  Should any mission critical component fail, that system fails and *national security is impacted.*  [Footnote omitted.]

S. Rep. No. 112-167, at 7-8 (2012) [emphasis added].

Defendant is already receiving a two-level enhancement for selling counterfeit military goods.

However, this case involves several aggravating factors.  First, the sheer scope of defendant's offense is an important factor.  His offense spanned many years and is not a situation in which a defendant had a short-term lapse of judgment.  Indeed, the 1,307 counterfeit Xilinx parts seized from defendant's residence during the search represent a small percentage of the number of suspected counterfeit parts found by agents; based on limited resources, only about 10% of the parts were chosen to be analyzed based on the ones believed to be the most critical and valuable.[7]

_____

[7] Under the terms of his plea agreement, defendant has agreed to forfeit all of the suspected/presumed counterfeit integrated circuits seized by the government in connection with this case, totaling 169,148 ICs (most seized from his residence).  See full inventory of ICs listed in the attachments to the Government's Unopposed Application for Entry of Preliminary Order of Forfeiture, filed on April 9, 2019 (Docket No. 30) and the Declaration of Publication,

11

Second, numerous undercover calls and historical emails showed that defendant went to great lengths to deceive end users so they would not discover that the ICs he sold were blacktopped and remarked.  One egregious example is already cited in the plea agreement and PSR, namely, that defendant instructed a Chinese test lab to create both a complete and sanitized version of a test report and then gave the sanitized version to his customer (Company A) to hide the fact that the Intel ICs had been blacktopped and remarked.  The difference between the two reports is striking.  (See Exhibits 1 and 2.)  Most disturbing, after reading the complete test report, defendant knew how problematic these ICs were and despite that knowledge, *he sold them anyway.*[8]

Finally, the government is extremely concerned about the fact that defendant sold thousands of counterfeit ICs that have ended up in the military supply chain.  The government has issued formal notices to the public warning of the counterfeit ICs that it has identified and it is continuing to assess risks.  Defendant's sale of 8,000 counterfeit Intel parts to Company A has particularly impacted

---

filed on May 16, 2019 (Docket 38). To be conservative, in its loss calculation the parties have agreed only to include those ICs that were analyzed by the government and thus, the government stands by its loss stipulation as set forth in the plea agreement.

[8] One of the best examples of defendant's attitude toward his customers is his 2015 email exchange with a supplier (Grace). The exchange reflects that defendant's customer cancelled an order after discovering the ICs were remarked.  Defendant, in turn, sought a refund from his supplier, telling her the ink came off too easily, she did a bad job of remarking (he refers to as refurbishing), and she needs to remark parts so they pass the acetone test. She explained almost no remarked parts will pass the acetone test, adding "You lose the order cause you didn't quote the truth to your customer."  Defendant replied, "If I tell FUKING CUSTOMER PARTS ARE REFURBISH YOU WON'T GET A DAM ORDER FROM ANY CUSTOMER IN USA.  WHO IN USA WANTS TO BUY REFURBISH PARTS." (caps in original) (See Exhibit 3.)

12

the military.  Since discovering over the last year that many of these counterfeit Intel ICs were in products sold to the U.S. Army, the U.S. Navy and the U.S. Marine Corps for various military applications, the military has been assessing the situation.  Prior to sentencing, the government anticipates receiving a Victim Impact Statement from the U.S. Army describing in more detail the significant impact of defendant's offenses, and the government will file it as soon as received.

**B.    History and Characteristics of Defendant**

Regarding defendant's history and characteristics, defendant has no prior convictions.  Although defendant cites to a difficult childhood as a result of his parents' divorce, the Probation Officer notes that he was raised in a loving home with his grandmother. (PSR 72.)  While defendant cites to his current family situation, this is, sadly, not unlike what many law-abiding families experience.

Defendant has submitted numerous letters from friends and family attesting to his good character, which defendant argues demonstrate his "diligence, sincerity, integrity, honesty and loyalty, and acts as a mentor and guide." (Supplemental Sentencing Position, p. 3.) While family and friends often wish to write letters to support a defendant, it is very clear from these letters that the writers are completely unaware of defendant's serious and long-term crime involving fraud and deceit, to which he has pled guilty.

The facts of this case speak for themselves.  At most, the letters show that defendant was leading dual lives: portraying himself in his personal life as a devoted family man and caring member of the community, but at the same time, in his business

1  dealings, he was callously committing multiple and serious acts of
2  deceit and fraud with potentially dangerous consequences.

3  **C.   Need for Just Punishment and Adequate Deterrence**

4  Serious offenses deserve serious sentences to account for the
5  sentencing goals of 18 U.S.C. § 3553(a).  As noted above, in creating
6  subsection 2320(a)(3) as part of the National Defense Authorization
7  Act of 2011, Congress was very concerned with the problem of
8  counterfeit electronics entering the military supply chain.  A
9  significant sentence here is especially important to deter other
10  would-be resellers from importing and selling counterfeit circuits
11  that could end up purchased and used by the U.S. military, as
12  defendant did here.[9]

13  **D.   Need to Avoid Unwarranted Sentencing Disparity**

14  A 45-month sentence will not result in unwarranted sentencing
15  disparity.  The recommended sentence actually reflects a one-level
16  downward variance from level 23 to 22 and a sentence in the middle of
17  the resulting guideline range, and carefully balances the significant
18  aggravating circumstances with other factors.

19  In a 2013 counterfeit military goods case, <u>United States v.</u>
20  <u>Peter Picone</u>, Case No. 13-cr-128-AWT, in the District of Connecticut,
21  defendant was sentenced to 37 months imprisonment following his
22  guilty plea to conspiracy to traffic in counterfeit military goods,
23  in violation of 18 U.S.C. 2320(a).  Defendant Picone's stipulated
24  total offense level was 21, with an advisory guideline range of 37 to

25

26  _____

27  [9] Paragraph 83 of the PSR states that defendant and his brother
operate an "aircraft parts sales company" from defendant's home.
28  Although not directly related to deterrence, the government is
concerned that despite defendant's convictions in this case,
defendant is now selling aircraft parts.

14

46 months.  Defendant should receive a higher sentence than Picone, given defendant's higher stipulated total offense level, 23, and higher advisory range of 46-57 months.  With a one-level downward variance, defendant's range is 41-51 months.

### E.  Restitution

The government recommends restitution in the amount of $144,000 to Intel Corporation, representing the loss attributable to the completed sale of the 8,000 counterfeit Intel ICs defendant sold to Company A, which resold them to Company B.[10]

## VI.  CONCLUSION

For the foregoing reasons, the government respectfully requests that this Court impose the following sentence: (a) 45-months imprisonment; (b) 3 years supervised release; (c) a special assessment of $400; and (d) total restitution in the amount of 144,000 and further requests that the preliminary order of forfeiture be incorporated into the judgment.

Dated: May 22, 2019              Respectfully submitted,

                                 NICOLA T. HANNA
                                 United States Attorney

                                 PATRICK R. FITZGERALD
                                 Assistant United States Attorney
                                 Chief, National Security Division


                                        /s/
                                 _____
                                 LISA E. FELDMAN
                                 Assistant United States Attorney

                                 Attorneys for Plaintiff
                                 UNITED STATES OF AMERICA

---

[10] Based on the facts of this particular case, the government is not seeking restitution for the counterfeit ICs sold to the UCA, seized during the search warrant or seized by U.S Customs.  However, those counterfeit ICs are properly included in the loss calculation and in the preliminary order of forfeiture issued in this case.

EXHIBIT  1

SUBJECT TO PROTECTIVE AGREEMENT

Test Report No. : ATC16041707-1                                Advanced-Lab Technology Centre

| Part Type | : | MICROCONTROLLER |
|---|---|---|
| Manufacturer | : | Intel |
| Part Number | : | S80C196KB12 |
| Date Code | : | 0235/0338 |
| Quantity | : | 2050 |

# Table of Contents

1. Introduction ..................................................................................................3

2. Results ........................................................................................................3

    2.1 Received Shipment Details ........................................................................3

    2.2 Electrical Conductivity Results ..................................................................4

    2.3 Die check ............................................................................................5

    2.4 Inspection Check ...................................................................................6

3. Conclusion ...................................................................................................7

Appendix 1 External Visual Inspection Anomalies ....................................................8

Appendix 2 Device Package ..............................................................................9

Appendix 3 Inspections...................................................................................10

Appendix 4 Dimensions...................................................................................18

Appendix 5 Electrical Conductivity Test Results .....................................................19

SUBJECT TO PROTECTIVE AGREEMENT                    PRB 004209

Test Report No. : ATC16041707-1                     Advanced-Lab Technology Centre

| Part Type | : | **MICROCONTROLLER** |
|---|---|---|
| Manufacturer | : | **Intel** |
| Part Number | : | **S80C196KB12** |
| Date Code | : | **0235/0338** |
| Quantity | : | **2050** |

# 1. Introduction

A quantity of 2050 devices of part number S80C196KB12 was received.

10 samples were conducted for external visual inspections for criteria listed in Appendix 1 using a microscope and 1 sample was conducted for Die Check.

2050 devices were tested for electrical conductivity test in accordance with the pin configuration.

# 2. Results
## 2.1 Received Shipment Details
i)   Received package type from carrier:
     ☒Box,   ☐bag,   ☐tray,   ☐reel,   ☐other

ii)   Number of package received from carrier :
      1

iii)  Condition of package:
      ☐Good,  ☒Fair,  ☐Poor,  ☐Other

iv)   Did parts show any signs of damage as a result of shipping?
      ☐Yes,  ☒No

v)    Packing Material :
      ☒Anti-static Bag  ☒desiccant pouches  ☐Other

vi)   Does the product information on the labels, bags, boxes or reels match the part number?
      ☒Yes,  ☐No,  ☐Other(No product information)

vii)  Parts shipped in:
      ☒trays  ☐tubes  ☐reels  ☐bags  ☐other

viii) Tray Conditions (if applicable)
      ☒Suitable trays  ☐ Unsuitable trays  ☐Not Applicable

ix)   Parts Package Type:
      Expected = QFP-80          Received = QFP-80

Remark: X = Selected item

SUBJECT TO PROTECTIVE AGREEMENT          PRB 004210

Test Report No. : ATC16041707-1                     Advanced-Lab Technology Centre

| Part Type | : | **MICROCONTROLLER** |
| Manufacturer | : | **Intel** |
| Part Number | : | **S80C196KB12** |
| Date Code | : | **0235/0338** |
| Quantity | : | **2050** |

## 2.2 Electrical Conductivity Results

🔵  The pin configuration was shown as below:



🔵  The electrical conductivity summary is listed as below:

| Item | Electrical Conductivity Test |
|---|---|
| Tested Quantity | 2049 |
| Passed | 1980 |
| Pass % | 96.63% |
| Failed | 69 |
| Failure % | 3.37% |

For details of electrical conductivity results, refer to the appendix of this report.

SUBJECT TO PROTECTIVE AGREEMENT          PRB 004211

Test Report No. : ATC16041707-1                                    Advanced-Lab Technology Centre

| Part Type | : | MICROCONTROLLER |
| Manufacturer | : | Intel |
| Part Number | : | S80C196KB12 |
| Date Code | : | 0235/0338 |
| Quantity | : | 2050 |

## 2.3 Die check

1 sample was conducted for Die check. The Intel logo, Number 83C196KB and 1986 were found on the die, the devices may share the same die.

Die Check details are as below:

**Pic#1**



SUBJECT TO PROTECTIVE AGREEMENT                    PRB 004212

Test Report No. : ATC16041707-1                    Advanced-Lab Technology Centre

| Part Type | : | **MICROCONTROLLER** |
|---|---|---|
| Manufacturer | : | Intel |
| Part Number | : | S80C196KB12 |
| Date Code | : | 0235/0338 |
| Quantity | : | 2050 |

## 2.4 Inspection Check

Summary of physical inspection for marking and package using microscope of 10-40x
is listed in table below.

| External Visual Inspection | | | |
|---|---|---|---|
| Specifications: Intel 8XC196KB Datasheet | | Discrepancies : Yes | |
| Inspection Sample :10 | | Body Type : Chip | |
| Items | Description | Pass/Fail | Remarks |
| 1 | Foreign Material | Acceptable | |
| 2 | Lead Condition | Unacceptable | Found all samples with minor oxidation leads, 3 samples with serious oxidation leads, and 5 samples with scratches on leads. |
| 3 | Markings | Acceptable | |
| 4 | Package Condition | Unacceptable | Found non-uniform coating of top/bottom side from part to part. |
| 5 | Seal | Acceptable | |
| Inspected By : Fujian Date : 9-May-16 | Verified by: Miki Date : 9-May-16 | Results : Unacceptable | |

SUBJECT TO PROTECTIVE AGREEMENT          PRB 004213

Test Report No. : ATC16041707-1                    Advanced-Lab Technology Centre

| Part Type | : | **MICROCONTROLLER** |
| **Manufacturer** | : | **Intel** |
| **Part Number** | : | **S80C196KB12** |
| **Date Code** | : | **0235/0338** |
| **Quantity** | : | **2050** |

## 3. Conclusion

<u>CERTIFICATE of COMPLIANCE</u>

Advanced-Lab Technology Centre hereby certifies that the above reference devices are testing in compliance with all requirements set forth with specific product specification.

| Test | Specification/Method | QTY | Quantity Accepted | Quantity Rejected | Remark |
|---|---|---|---|---|---|
| External Visual Inspection | MIL-STD-883H Method 2009.10 "External visual" and IDEA-STD-1010B Section 10.3.1 | 10Pcs | 0 | 10 | - |
| Physical Dimensions | MIL-STD-883H Method 2016 "Physical Dimensions" and Intel 8XC196KB Datasheet | 5Pcs | - | - | * |
| Retopping Test | - | 1Pcs | 0 | 1 | - |
| Die Check | MIL-STD-883H Method 2014 "Internal Visual and Mechanical" and IDEA-STD-1010B Section 11.7 | 1Pcs | - | - | ** |
| Electrical Conductivity | Intel 8XC196KB datasheet | 2049Pcs | 1980 | 69 | - |

Remark: *Dimensions for reference only.

**The Intel logo, Number 83C196KB and 1986 were found on the die, the devices may share the same die.

| Prepared by | Fujian |
| Verified by | Miki |
| Certified by | Kakuen Tse, MIET, MIEEE, MIIE. |
| Date | 10-May-16 |

SUBJECT TO PROTECTIVE AGREEMENT          PRB 004214

| Part Type | : | MICROCONTROLLER |
|---|---|---|
| Manufacturer | : | Intel |
| Part Number | : | S80C196KB12 |
| Date Code | : | 0235/0338 |
| Quantity | : | 2050 |

## Appendix 1 External Visual Inspection Anomalies

| 1.   FOREIGN MATERIAL | 3.5 Pin one indicator / strip |
|---|---|
| 1.1 Bridging Leads | 3.6 Unscratched top/bottom |
| 1.2 Bridging Lid to Leads | 4.   IC PACKAGE CONDITION |
| 1.3 In Seal Material | 4.1 Correct package type |
| 1.4 On Lead(s) | 4.2 Broken |
| 1.5 On Package | 4.3 Chipped |
| 2.   LEAD CONDITION | 4.4 Crazed or bubbled surface |
| 2.1 Bent, | 4.5 Physical Dimensions |
| 2.2 Corroded | |
| 2.3 Misaligned | |
| 2.4 Missing | |
| 2.5 Exposed copper, damaged or Scored | |
| 3.   MARKINGS | |
| 3.1 Illegible | |
| 3.2 Non-conformant to cuts. paperwork | |
| 3.3 Non-homogeneous from part to part Consistent lot, date code and country of original on top and bottom | |
| 3.4 Smeared, sanding traces or easily be removed | |

SUBJECT TO PROTECTIVE AGREEMENT                    PRB 004215

Test Report No. : ATC16041707-1                    Advanced-Lab Technology Centre

| Part Type | : | MICROCONTROLLER |
|---|---|---|
| Manufacturer | : | Intel |
| Part Number | : | S80C196KB12 |
| Date Code | : | 0235/0338 |
| Quantity | : | 2050 |

## Appendix 2 Device Package

Received a box



Open the box



Unpack the box



Label on one bag



Devices in the trays



SUBJECT TO PROTECTIVE AGREEMENT          PRB 004216

Advanced-Lab Technology Centre

| Part Type | : | MICROCONTROLLER |
| Manufacturer | : | Intel |
| Part Number | : | S80C196KB12 |
| Date Code | : | 0235/0338 |
| Quantity | : | 2050 |

# Appendix 3 Inspections

## Ⅰ. Device Pictures

### Top view



### Bottom view



SUBJECT TO PROTECTIVE AGREEMENT          PRB 004217

Test Report No. : ATC16041707-1                    Advanced-Lab Technology Centre

| Part Type | : | MICROCONTROLLER |
|---|---|---|
| Manufacturer | : | Intel |
| Part Number | : | S80C196KB12 |
| Date Code | : | 0235/0338 |
| Quantity | : | 2050 |

## Ⅱ. Re-topping Test:

**Topping can be removed on Re-topping Test.**

Before apply solvent                              After apply solvent

     

**Cotton swab is dirty after Retopping Test**



SUBJECT TO PROTECTIVE AGREEMENT          PRB 004218

Test Report No. : ATC16041707-1                                  Advanced-Lab Technology Centre

| Part Type | : | MICROCONTROLLER |
|-----------|---|-----------------|
| Manufacturer | : | Intel |
| Part Number | : | S80C196KB12 |
| Date Code | : | 0235/0338 |
| Quantity | : | 2050 |

## Ⅲ. External Inspections

**Top side:**

**Found non-uniform coating of top side from part to part.**

**Sample 1**



**Sample 2**



**Sample 3**



**Sample 4**



**Sample 5**



**Sample 6**



SUBJECT TO PROTECTIVE AGREEMENT            PRB 004219

Test Report No. : ATC16041707-1                    Advanced-Lab Technology Centre

| Part Type | : | MICROCONTROLLER |
|---|---|---|
| Manufacturer | : | Intel |
| Part Number | : | S80C196KB12 |
| Date Code | : | 0235/0338 |
| Quantity | : | 2050 |

**Sample 7**



**Sample 8**



**Sample 9**



**Sample 10**



SUBJECT TO PROTECTIVE AGREEMENT          PRB 004220

Test Report No. : ATC16041707-1                     Advanced-Lab Technology Centre

| Part Type | : | MICROCONTROLLER |
|---|---|---|
| Manufacturer | : | Intel |
| Part Number | : | S80C196KB12 |
| Date Code | : | 0235/0338 |
| Quantity | : | 2050 |

## Bottom side:

**Found non-uniform coating of bottom side from part to part.**

**Sample 1**



**Sample 2**



**Sample 3**



**Sample 4**



**Sample 5**



**Sample 6**



SUBJECT TO PROTECTIVE AGREEMENT          PRB 004221

Test Report No. : ATC16041707-1                    Advanced-Lab Technology Centre

| Part Type | : | MICROCONTROLLER |
|---|---|---|
| Manufacturer | : | Intel |
| Part Number | : | S80C196KB12 |
| Date Code | : | 0235/0338 |
| Quantity | : | 2050 |

**Sample 7**



**Sample 8**



**Sample 9**



**Sample 10**



SUBJECT TO PROTECTIVE AGREEMENT          PRB 004222

Test Report No. : ATC16041707-1                    Advanced-Lab Technology Centre

| Part Type | : | **MICROCONTROLLER** |
|---|---|---|
| Manufacturer | : | **Intel** |
| Part Number | : | **S80C196KB12** |
| Date Code | : | **0235/0338** |
| Quantity | : | **2050** |

## Leads conditions:

**Found all samples with minor oxidation leads, 3 samples with serious oxidation leads, and 5 samples with scratches on leads.**

**Sample 1**



**Sample 2**



**Sample 3**



**Sample 4**



**Sample 5**



**Sample 6**



SUBJECT TO PROTECTIVE AGREEMENT              PRB 004223

Advanced-Lab Technology Centre

| Part Type | : | MICROCONTROLLER |
| Manufacturer | : | Intel |
| Part Number | : | S80C196KB12 |
| Date Code | : | 0235/0338 |
| Quantity | : | 2050 |

**Sample 7**



**Sample 8**



**Sample 9**



**Sample 10**



SUBJECT TO PROTECTIVE AGREEMENT          PRB 004224

Test Report No. : ATC16041707-1                    Advanced-Lab Technology Centre

| Part Type | : | MICROCONTROLLER |
|---|---|---|
| Manufacturer | : | Intel |
| Part Number | : | S80C196KB12 |
| Date Code | : | 0235/0338 |
| Quantity | : | 2050 |

## Appendix 4 Dimensions

### (5 samples)
Dimensions for reference only



| Sample | Dimensions(mm) | | | |
|---|---|---|---|---|
| | D | E | A | e1 |
| | 25* | 19* | 3* | 0.8* |
| 1 | 23.82 | 17.75 | 3.09 | 0.80 |
| 2 | 23.85 | 17.79 | 3.10 | 0.80 |
| 3 | 23.90 | 17.80 | 3.05 | 0.80 |
| 4 | 23.88 | 17.77 | 3.06 | 0.80 |
| 5 | 23.92 | 17.82 | 3.08 | 0.80 |

Remark:* Approx.

SUBJECT TO PROTECTIVE AGREEMENT                    PRB 004225

| Part Type | : | MICROCONTROLLER |
|---|---|---|
| Manufacturer | : | Intel |
| Part Number | : | S80C196KB12 |
| Date Code | : | 0235/0338 |
| Quantity | : | 2050 |

## Appendix 5 Electrical Conductivity Test Results

I. Summary of test results were listed and shown as below:

| D/C | Quantity | Electrical Conductivity Test | Results |
|---|---|---|---|
| 0338 | 1654 | Pass[*] | Favorable |
| | 326 | Pass[**] | Favorable |
| | 69 | Failed | Unfavorable |
| 0235 | 177 | Pass | Favorable |

Remark: [*]Internal pin connection: (D/C: 0338/0235)

| VSS | pin10-pin11; pin27-pin42-pin63; pin54-pin55 |
|---|---|
| VCC | pin12-pin13 |

Remark: [**]Internal pin connection: (D/C: 0338)

| VSS | pin10-pin11- pin33-pin42-pin51-pin54-pin55- pin63-pin79 |
|---|---|
| VCC | pin12-pin13-pin29- pin52-pin75 |

II. Captured Screen Test Results Samples for Reference:



SUBJECT TO PROTECTIVE AGREEMENT                    PRB 004226

EXHIBIT  2

Test Report No. : ATC16041707-2                     Advanced-Lab Technology Centre



**Advanced-Lab Technology centre**

| Test Report No. | ATC16041707-2 |
|---|---|
| Issue No. | 2 |
| Date | 10-May-16 |

## Test Analysis Report
### For
## MICROCONTROLLER S80C196KB12

| | | |
|---|---|---|
| **Customer** | : | ▮▮▮▮▮▮▮ |
| **Part Type** | : | **MICROCONTROLLER** |
| **Manufacturer** | : | **Intel** |
| **Date Code** | : | **0235/0338** |
| **Quantity Received** | : | **2050** |
| **Sample Inspected** | : | **1(Die Check)/2049(Electrical Conductivity)** |
| **Lot Disposition** | : | |

**Die Check** – 1 sample was conducted for Die check in accordance with MIL-STD-883H 2014 "Internal visual and mechanical" and IDEA-STD-1010B section 11.7. The Intel logo, Number 83C196KB and 1986 were found on the die, the devices may share the same die.

**Electrical Conductivity** – 2049 devices were tested for electrical conductivity test in accordance with the device specifications. The test results were that 1980 devices were favorable, and 69 devices were unfavorable.

| Prepared By: | Fujian | Verified By: | Miki |
|---|---|---|---|
| **Approved and Certified By:** | **Kakuen Tse**<br>**Member IET, Member IEEE, Member IIE** | | |

© Advanced-lab Technology Centre 2016

SUBJECT TO PROTECTIVE AGREEMENT          PRB 004228

Advanced-Lab Technology Centre

| Part Type | : | **MICROCONTROLLER** |
|---|---|---|
| **Manufacturer** | : | **Intel** |
| **Part Number** | : | **S80C196KB12** |
| **Date Code** | : | **0235/0338** |
| **Quantity** | : | **2050** |

# Table of Contents

1. Introduction ............................................................................................3

2. Results ....................................................................................................3

    2.1 Received Shipment Details .................................................................3

    2.2 Electrical Conductivity Results ..........................................................4

    2.3 Die check ...........................................................................................5

3. Conclusion ..............................................................................................6

Appendix 1 Device Package .........................................................................7

Appendix 2 Device Pictures..........................................................................8

Appendix 3 Electrical Conductivity Test Results .........................................9

SUBJECT TO PROTECTIVE AGREEMENT          PRB 004229

Test Report No. : ATC16041707-2                    Advanced-Lab Technology Centre

| Part Type | : | **MICROCONTROLLER** |
|---|---|---|
| **Manufacturer** | : | **Intel** |
| **Part Number** | : | **S80C196KB12** |
| **Date Code** | : | **0235/0338** |
| **Quantity** | : | **2050** |

# 1. Introduction

A quantity of 2050 devices of part number S80C196KB12 was received.

1 sample was conducted for Die Check.

2050 devices were tested for electrical conductivity test in accordance with the pin configuration.

# 2. Results
## 2.1 Received Shipment Details

i)   Received package type from carrier:
     ☒Box,  ☐bag,  ☐tray,  ☐reel,  ☐other

ii)  Number of package received from carrier :
     1

iii) Condition of package:
     ☐Good, ☒Fair, ☐Poor, ☐Other

iv)  Did parts show any signs of damage as a result of shipping?
     ☐Yes, ☒No

v)   Packing Material :
     ☒Anti-static Bag  ☒desiccant pouches  ☐Other

vi)  Does the product information on the labels, bags, boxes or reels match the part number?
     ☒Yes, ☐No, ☐Other(No product information)

vii) Parts shipped in:
     ☒trays ☐tubes ☐reels ☐bags ☐other

viii) Tray Conditions (if applicable)
     ☒Suitable trays ☐ Unsuitable trays ☐Not Applicable

ix)  Parts Package Type:
     Expected = QFP-80          Received = QFP-80

Remark: X = Selected item

---

SUBJECT TO PROTECTIVE AGREEMENT          PRB 004230

| Part Type | : | MICROCONTROLLER |
|---|---|---|
| Manufacturer | : | Intel |
| Part Number | : | S80C196KB12 |
| Date Code | : | 0235/0338 |
| Quantity | : | 2050 |

## 2.2 Electrical Conductivity Results

🔵  The pin configuration was shown as below:



🔵  The electrical conductivity summary is listed as below:

| Item | Electrical Conductivity Test |
|---|---|
| Tested Quantity | 2049 |
| Passed | 1980 |
| Pass % | 96.63% |
| Failed | 69 |
| Failure % | 3.37% |

For details of electrical conductivity results, refer to the appendix of this report.

SUBJECT TO PROTECTIVE AGREEMENT            PRB 004231

| Part Type | : | MICROCONTROLLER |
|---|---|---|
| Manufacturer | : | Intel |
| Part Number | : | S80C196KB12 |
| Date Code | : | 0235/0338 |
| Quantity | : | 2050 |

## 2.3 Die check

1 sample was conducted for Die check. The Intel logo, Number 83C196KB and 1986 were found on the die, the devices may share the same die.

Die Check details are as below:

**<u>Pic#1</u>**



SUBJECT TO PROTECTIVE AGREEMENT                    PRB 004232

Test Report No. : ATC16041707-2                    Advanced-Lab Technology Centre

| Part Type | : | **MICROCONTROLLER** |
|---|---|---|
| **Manufacturer** | : | **Intel** |
| **Part Number** | : | **S80C196KB12** |
| **Date Code** | : | **0235/0338** |
| **Quantity** | : | **2050** |

## 3. Conclusion

<u>**CERTIFICATE of COMPLIANCE**</u>

Advanced-Lab Technology Centre hereby certifies that the above reference devices are testing in compliance with all requirements set forth with specific product specification.

| Test | Specification/Method | QTY | Quantity Accepted | Quantity Rejected | Remark |
|---|---|---|---|---|---|
| Die Check | MIL-STD-883H Method 2014 "Internal Visual and Mechanical" and IDEA-STD-1010B Section 11.7 | 1Pcs | - | - | ** |
| Electrical Conductivity | Intel  8XC196KB   datasheet | 2049Pcs | 1980 | 69 | - |

Remark: *Dimensions for reference only.

    **The Intel logo, Number 83C196KB and 1986 were found on the die, the devices may share the same die.

| Prepared by | Fujian |
|---|---|
| Verified by | Miki |
| Certified by | Kakuen Tse, MIET, MIEEE, MIIE. |
| Date | 10-May-16 |

SUBJECT TO PROTECTIVE AGREEMENT          PRB 004233

Test Report No. : ATC16041707-2                    Advanced-Lab Technology Centre

| Part Type | : | MICROCONTROLLER |
|---|---|---|
| Manufacturer | : | Intel |
| Part Number | : | S80C196KB12 |
| Date Code | : | 0235/0338 |
| Quantity | : | 2050 |

# Appendix 1 Device Package

Received a box



Open the box



Unpack the box



Label on one bag



Devices in the trays



SUBJECT TO PROTECTIVE AGREEMENT          PRB 004234

Test Report No. : ATC16041707-2                    Advanced-Lab Technology Centre

| Part Type | : | MICROCONTROLLER |
| Manufacturer | : | Intel |
| Part Number | : | S80C196KB12 |
| Date Code | : | 0235/0338 |
| Quantity | : | 2050 |

## Appendix 2 Device Pictures

### Top view



### Bottom view



SUBJECT TO PROTECTIVE AGREEMENT          PRB 004235

Test Report No. : ATC16041707-2                    Advanced-Lab Technology Centre

| Part Type | : | MICROCONTROLLER |
|---|---|---|
| Manufacturer | : | Intel |
| Part Number | : | S80C196KB12 |
| Date Code | : | 0235/0338 |
| Quantity | : | 2050 |

## Appendix 3 Electrical Conductivity Test Results

I. Summary of test results were listed and shown as below:

| D/C | Quantity | Electrical Conductivity Test | Results |
|---|---|---|---|
| 0338 | 1654 | Pass[*] | Favorable |
| | 326 | Pass[**] | Favorable |
| | 69 | Failed | Unfavorable |
| 0235 | 177 | Pass | Favorable |

Remark: [*]Internal pin connection: (D/C: 0338/0235)

| VSS | pin10-pin11; pin27-pin42-pin63; pin54-pin55 |
|---|---|
| VCC | pin12-pin13 |

Remark: [**]Internal pin connection: (D/C: 0338)

| VSS | pin10-pin11- pin33-pin42-pin51-pin54-pin55- pin63-pin79 |
|---|---|
| VCC | pin12-pin13-pin29- pin52-pin75 |

II. Captured Screen Test Results Samples for Reference:



SUBJECT TO PROTECTIVE AGREEMENT            PRB 004236

EXHIBIT  3

| | |
|---|---|
| **From:** | James Harrison <jharrison@prblogics.com> |
| **Sent:** | 11/9/2015 1:38:01 PM +0000 |
| **To:** | 'Grace Yerkes' |
| **Subject:** | RE: FW: FEDEX 2 days morning delivery COD TRACKING # 807902193070 PART # XC9536-10VQ44I |

If I tell the FUKING CUSTOMER PARTS ARE REFURBISH YOU WONT GET A DAM ORDER FROM OR FROM ANY CUSTOMER IN USA

WHO IN USA WANTS TO BUY REFURBSH PARTS

PLEASE DO NOT BE STUPID IF YOU WANT TO KEEP THE MONEY AND CHEAT ME KEEP THE MONEY

THERE ARE COMPANIES FROM THE GOVERNMENT THAT I TELL YOU OUTFRONT I CANT TAKE THE ORDER BECAUSE THEY TELL ME STRAIGHT OUT THEY CANT USE REFURBISH

BUT THERE ARE COMPANIES THAT DO NOT SPECIFY IT, AND I TAKE CHANCES.

DO YOU THINK CUSTOMERS IN USA WANT TO USE REFURBISH PARTS? I AM SO ANGRY WITH YOU

**From:** Grace Yerkes [mailto
**Sent:** Monday, November 09, 2015 5:32 AM
**To:** James Harrison
**Subject:** Re: FW: FEDEX 2 days morning delivery COD TRACKING # 807902193070 PART # XC9536-10VQ44I

Almost all the refurb ones can't pass Acetone test.I quoted you that they are refurb one.You lose the order cause you didn't quote the truth to your customer.

Regards
Grace
LCD & IC Sale Agent

On Mon, Nov 9, 2015 at 9:23 PM, James Harrison <jharrison@prblogics.com> wrote:

Listen do not sell me parts that do not pass the acetone test. If you cant find a good source in ASIA that can do a good remarking do not sell me the parts do not quote me the parts

SUBJECT TO PROTECTIVE AGREEMENT          PRB VASQUEZ 002884

I have other suppliers that can remark parts and pass the acetone test.

What do you want me to do here to lose on parts and lose on freight and lose a customer because you didnt do a good job remarking the parts?

You need to take responsibility in your actions

**From:** Grace Yerkes
**Sent:** Monday, November 09, 2015 5:01 AM
**To:** James Harrison
**Subject:** Re: FW: FEDEX 2 days morning delivery COD TRACKING # 807902193070 PART # XC9536-10VQ44I

James,good day.Refurb ones can accept function test except Acetone test.We can't accept the return for this reason.

Regards
Grace



On Sat, Nov 7, 2015 at 12:22 AM, James Harrison <jharrison@prblogics.com> wrote:

Look below the parts you just send me look bad they are counterfeit, the customer cancel the order

You need to do a better job my friend. the ink come off so easy , we cant have that.

I know parts are refurbish but you need to do a better job in refurbishing the parts

This is a problem,

Dear James,

We have received the product this morning and as you can see from the pictures below, the marking of these parts come off very easily which shows the recondition/counterfeit: